UNITED STATES of America, Plaintiff–Appellee,

v.

Michael Andrew SMITH, aka The Bird, Defendant–Appellant.

No. 00–30120.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 2001

Filed March 7, 2002.

Sheryl Gordon McCloud, Law Offices of
Sheryl Gordon, McCloud, Seattle, WA, for
the defendant-appellant/appellee.

Annette L. Hayes, United States Attorney's Office, Seattle, WA, for the plaintiff-appellee/appellant.

Before: LAY *, TROTT, and BERZON, Circuit Judges.

TROTT, Circuit Judge.

## Overview

Between 1996 and 1998, an extensive organization attempted to import into the United States three large loads of marijuana. Appellant Michael Smith was involved in the first two of those attempts. The organization initially attempted to import marijuana on a boat named the "OK Tedi." When the U.S. Coast Guard intercepted the OK Tedi, the crew set fire to the vessel. Smith was not on board the OK Tedi, but he was found nearby on a small support craft.

A year later, the organization attempted to import marijuana from Cambodia. That attempt failed when Cambodian police caught members of the organization, including Smith, loading marijuana onto a boat at a Cambodian port.

The government charged Smith with four counts: Count 1 charged conspiracy to import marijuana; Count 2 charged attempted importation of marijuana with respect to the OK Tedi load; Count 3 also involved the OK Tedi load and charged aiding and abetting the possession of marijuana with intent to distribute on a vessel subject to U.S. jurisdiction; and Count 4 charged attempted importation of marijua-

na with respect to the Cambodian load. See 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(G), 963; 46 U.S.C.App. § 1903; and 18 U.S.C. § 2. A jury convicted Smith of all counts, and the court sentenced him to 145 months' imprisonment.

Smith raises several claims of error in his timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and for the reasons expressed below, we affirm.

## I. Motions For Substitute Counsel

### A. Smith's Second Pre–Trial Motion For Substitution of Counsel

#### 1. Background

Initially, court-appointed attorney James Roe represented Smith. Smith, claiming a lack of meaningful communication with Roe, sought new appointed counsel. Out of an abundance of caution, the court granted Smith's request. Walter Palmer was then court-appointed to represent Smith.

Smith again sought new appointed counsel. On August 28, 1999, Smith sent a letter to Palmer and the court, instructing Palmer to withdraw as counsel, and cutting off all communication between them. On September 14, 1999, Smith filed a formal motion seeking "substitution of a new court appointed lawyer." After holding a status conference to discuss Smith's letter and motion, the district court rejected Smith's motion to substitute counsel.

#### 2. Smith's August 28th Letter Was Not a Request to Proceed Pro Se

█ Smith first argues that his August 28th letter was a clear request to represent himself and that the district court

---

* The Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

erred by denying that request. We disagree.

■ A defendant's request to proceed pro se must be explicit and unequivocal. *See United States v. Arlt,* 41 F.3d 516, 519 (9th Cir.1994). Smith's August 28th letter does not meet this standard. The letter never once mentions Smith's purported desire to represent himself. Instead, the letter simply instructs Palmer to withdraw as appointed counsel due to "irreconcilable differences." Moreover, before the court ever ruled on Smith's supposed request to represent himself, Smith filed a motion asking for substitute counsel, wherein he stated clearly, "I cannot go Pro Se.... I need a new lawyer." At the status conference, Smith again asserted that he "wish[ed] to have a new court-appointed lawyer that will be effective." It is clear that all along, Smith was seeking substitute counsel, not to proceed pro se.

## 3. The Court Did Not Abuse Its Discretion in Denying Smith's Second Pre–Trial Motion to Substitute Counsel

■ Smith next argues that the district court abused its discretion in denying his motion to substitute. We review this question for an abuse of discretion, and should consider: (1) the timeliness of Smith's motion; (2) the adequacy of the court's inquiry; and (3) the extent of the conflict between the defendant and his counsel. *United States v. Corona–Garcia,* 210 F.3d 973, 976 (9th Cir.2000). We conclude that the court appropriately exercised its discretion.

*Timeliness:* Smith sent his August 28th letter to Palmer and the court over thirty days before the scheduled trial date. He sent his formal motion thirteen days before trial. Generally, such requests would be timely, *see United States v. Moore,* 159 F.3d 1154, 1161 (9th Cir.1998), but because new counsel probably would have required a continuance due to the complicated nature of the case, this factor only slightly favors Smith.

*Adequacy of Inquiry:* The court's inquiry was more than adequate. The court provided Smith the opportunity to support his papers with oral argument. The court patiently and exhaustively queried Smith about the extent of communication between himself and Palmer, and about Smith's reasons for seeking new counsel a second time. The court confirmed that Palmer was prepared for trial. Finally, the court allowed the government to "weigh-in on this subject." Therefore, this factor favors the government. *See Corona–Garcia,* 210 F.3d at 976–77 (approving of similar inquiry).

*Extent of the Conflict:* The circumstances of this case do not present an extensive, irreconcilable conflict. First, Smith's own letter indicates that the dispute about when to file a discovery motion stemmed from a disagreement about "strategic purposes" and the application of "local Rule 16." Litigation tactics are decisions generally left to defense counsel. *Id.* at 977 n. 1. Second, Palmer filed on-time the disputed discovery motion, though not in Smith's preferred words, and was able to obtain substantial information from the government. *See United States v. Garcia,* 924 F.2d 925, 927 (9th Cir.1991) ("The record reflects that [defense counsel] defended [the defendant] fully and forcefully."). Third, Smith's excuse for unilaterally cutting-off communication with Palmer was that "[he] didn't want to meet and discuss something and have nothing be done about it again." However, the record reflects that Palmer visited with Smith regularly, explained that strategy and compliance with local rules required him to wait in filing the discovery motion on-time, and did actually file the motion. Accord-

ingly, Smith's proffered justification appears to arise out of "general unreasonableness or manufactured discontent." *United States v. Walker*, 915 F.2d 480, 484 (9th Cir.1990). Finally, the district court already granted Smith one request for new counsel, and concluded that this second motion was filed to delay the proceedings. This factor strongly favors the government.

Under these circumstances, we hold that the district court appropriately exercised its discretion when it rejected Smith's second pre-trial motion for substitution of counsel.

## B. Smith's Post–Trial Motion to Substitute Counsel

### 1. Background

After the jury convicted him, Smith again moved pro se for new appointed counsel. Smith claimed that (1) Palmer had been ineffective at trial; and (2) there had been no meaningful communication between them. Without a hearing, the district court rejected Smith's motion.

### 2. The Court Did Not Abuse Its Discretion in Denying Smith's Post–Trial, Pre Sentencing Motion to Substitute Counsel

Smith argues that the court erred in denying his post-trial, pre-sentence motion for substitute counsel. Again, we review under the deferential abuse of discretion standard and consider (1) the timeliness of the motion; (2) the adequacy of the court's inquiry; and (3) the extent of the conflict. *Corona–Garcia*, 210 F.3d at 976. Though a closer question than the previous one, we conclude that under the circumstances, the district court did not abuse its discretion.

*Timeliness:* Smith timely filed his motion over five months before sentencing. However, because Smith had already been granted one substitution of counsel, and

was seeking to substitute one appointed counsel with another, delay is less of a consideration. *See United States v. Torres–Rodriguez*, 930 F.2d 1375, 1380 n. 2 (9th Cir.1991), ("A defendant who seeks to replace one appointed counsel with another ... will need to justify the replacement even in the absence of delay in the proceedings."), *overruled on other grounds by Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

*Adequacy of Inquiry:* The court conducted no inquiry concerning Smith's post-trial motion for substitution of counsel. Smith contends that this failure, by itself, constitutes reversible error. We disagree.

 There is no question that our case law favors an inquiry when a party seeks substitute counsel. *See, e.g., United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir.2000); *United States v. D'Amore*, 56 F.3d 1202, 1205 (9th Cir.1995). Despite this general preference, under certain circumstances, however, the failure to conduct a hearing is not *by itself* an abuse of discretion. Recognizing that our busy district courts are in the best position to consider a party's request for substitute counsel, we only require them to generate a "sufficient basis for reaching an informed decision." Conducting a formal inquiry is one way—probably the most common way—of developing a "sufficient basis," but it is not the only way. For instance, "the district court's failure to conduct a formal inquiry is not fatal error," if "[the defendant's] own description of the problem and the judge's own observations provide[ ] a sufficient basis for reaching an informed decision." *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986).

In this case, the district court was able to formulate "a sufficient basis for reaching an informed basis" without holding a

3779 hearing. The court had personally observed Palmer at trial and must have concluded that his legal work on behalf of Smith was not ineffective. *Moreover, the* court had already entertained two previous substitution motions alleging "lack of meaningful communication," and was thoroughly familiar with Smith's "lack of communication" argument. Therefore, this factor favors the government.

*Extent of the Conflict:* Smith's post-trial motion did not present an extensive, irreconcilable conflict. Smith's contention that Palmer had "numerous other cases," certainly did not raise an irreconcilable conflict. Moreover, as the district court stated in a later proceeding, "I observed you communicating with [Palmer], smiling, giving him questions, talking with him, acting as if everything was absolutely fine in connection with your communications and relationship with your attorney during the trial . . . ." Therefore, this factor favors the government.

Although it might have been preferable to conduct a hearing, under the circumstances of this case, the district court did not abuse its discretion, in denying Smith's post-trial, pre-sentencing request to substitute counsel.

## II. Jury Instruction on Count 3

### A. Background

Count 3 related to the OK Tedi load and charged Smith with aiding and abetting the possession of marijuana with the intent to distribute on a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C.App. § 1903 (2000) (" § 1903"). The government informed the court that under § 1903, "all jurisdictional issues . . . are preliminary questions of law to be determined solely by the trial judge." After listening to testimony, the court concluded that the jurisdictional requisite had been met and instructed the jury that to convict Smith of Count 3, it must find:

> *First,* someone committed the crime of possessing marijuana, with intent to distribute it;
>
> *Second,* the defendant knowingly and intentionally aided . . . someone to commit the crime of possession of marijuana, with intent to deliver it to another person; and
>
> *Third,* the defendant acted before the crime was completed.

ER at 143.

### B. The Omission of the Jurisdictional Issue and the "On Board" Element From the Jury Instructions Does Not Require Reversal

Smith contends that the court's instruction was erroneous because it omitted two essential elements of a § 1903 offense: (1) that someone was "on board a vessel"; and (2) that the OK Tedi was a vessel subject to the jurisdiction of the United States.

■ Because Smith did not object to the jury instructions at trial, we review his claims for plain error. *United States v. Shipsey,* 190 F.3d 1081, 1085 (9th Cir. 1999); *United States v. Uchimura,* 125 F.3d 1282, 1286–87 (9th Cir.1997). Plain error requires an (1) error, (2) that is plain, and (3) that affects substantial rights. *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). If these three conditions are met, we may exercise our discretion to notice the error, but only if it (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* (internal quotation omitted). As discussed below, we agree with Smith that the district court improperly omitted from its jury instructions two elements of a § 1903 offense; however, because the trial evidence concerning those two elements was

undisputed, Smith's substantial rights were not affected, and we need not reverse his conviction on Count 3.

■ Section 1903(a) states:

It is unlawful for any person on board a vessel of the United States, or *on board a vessel subject to the jurisdiction of the United States*, or who is a citizen of the United States ... on board any vessel, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

46 U.S.C. § 1903(a) (emphasis added).[1]

■ The language of § 1903 demonstrates that Congress intended to make the "on board a vessel" aspect an element of the offense. *See Liparota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute."). Indeed, the "on board a vessel" requirement is a key distinguishing factor between § 1903(a) and the traditional possession with intent to distribute offenses. *Compare* 46 U.S.C.App. § 1903(a) *with* 21 U.S.C. § 841(a). The district court's instruction, however, says nothing about any requirement that Smith or one of his co-conspirators be "on board a vessel." This omission constitutes an "error" that is "plain" from the face of the statute.

The district court's instruction also says nothing about whether the OK Tedi was "a vessel subject to the jurisdiction of the United States." *See* 46 U.S.C.App.1903(a). In 1995, we held that whether a vessel was subject to the jurisdiction of the United

States was an element of a § 1903 offense and had to be submitted to and decided by the jury. *See United States v. Medjuck*, 48 F.3d 1107, 1110 (9th Cir.1995). The government correctly observes that one year after *Medjuck*, Congress amended § 1903 by adding subsection (f), which provides: "Jurisdiction of the United States with respect to vessels subject to this chapter is not an element of any offense. All jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C.App. § 1903(f).

Several appellate courts have acknowledged the 1996 amendment to § 1903, but none has been asked to interpret § 1903(f)'s meaning. *See, e.g., United States v. Greer*, 223 F.3d 41, 55 (2d Cir. 2000); *United States v. Devila*, 216 F.3d 1009, 1014 n. 3 (11th Cir.2000), *vacated on other grounds by United States v. Devila*, 242 F.3d 995 (11th Cir.2001); *United States v. Klimavicius–Viloria*, 144 F.3d 1249, 1256 n. 1 (9th Cir.1999). At Smith's trial, the government argued and the district court agreed that under § 1903(f), the court, not the jury, should decide *both* (1) whether the United States has jurisdiction over the place where the vessel was allegedly intercepted; *and* (2) whether the vessel was actually intercepted at that place.

With all respect, we think the district court's interpretation was over-inclusive. Section 1903(f) empowers the court to make only the former determination; the latter question, as to where the vessel was intercepted, is a question of fact to be decided by the jury. In *United States v. Warren*, the defendant was charged with stabbing a man at Schofield Barracks, an army base located in Hawaii. 984 F.2d

---

1. The government points out that because Smith is a U.S. citizen, it did not have to prove that the OK Tedi was a vessel subject to the jurisdiction of the U.S. *See* 46 U.S.C.App. § 1903(a). It appears that Smith is a U.S. citizen, but we can tell, the government did not prove this at trial.

325, 327 (9th Cir.1993). The district court first determined that Schofield Barracks was an army base located within the special maritime jurisdiction of the United States. *Id.* However, the court's subsequent instructions said nothing about whether the jury had to find that the stabbing actually occurred on Schofield Barracks. *Id.* We held that the district court properly decided whether the base was within the jurisdiction of the United States, but that the instruction improperly omitted the issue of whether the stabbing occurred on the base. *Id.* "A district court 'may determine as a matter of law the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is an issue for the trier of fact.'" *Id.* (quoting *United States v. Gipe,* 672 F.2d 777, 779 (9th Cir.1982)); *accord United States v. Sohappy,* 770 F.2d 816, 821 (9th Cir.1985) (holding that district court properly determined whether "Cooks Landing" was "Indian country" and then correctly "instructed the jury that they need only find that the violations occurred in Cooks Landing"); *United States v. Jones,* 480 F.2d 1135, 1139 (2d Cir.1973) ("Here, the court's instruction correctly left the factual element—the locus of the crime—to the jury, while reserving the question of law—whether the federal government had accepted jurisdiction—to itself.").

Applying this dual inquiry to Smith's case, we are satisfied that the district court correctly decided itself whether the United States possesses jurisdiction over the waters where the government claimed the OK Tedi had been intercepted. *See Warren,* 984 F.2d at 327; *Sohappy,* 770 F.2d at 821; *Gipe,* 672 F.2d at 779; *Jones,* 480 F.2d at 1139. However, we believe the

district court's instruction, like the instruction in *Warren,* improperly omitted the *factual* issue of whether the OK Tedi was actually intercepted at that place. *See Warren,* 984 F.2d at 327; *Gipe,* 672 F.2d at 779.

■ We do not read section 1903(f)'s statement that "[a]ll jurisdictional issues . . . are preliminary questions of law to be determined solely by the trial judge" to require otherwise. The "jurisdictional issue"—whether the United States has jurisdiction over the waters where a vessel is allegedly intercepted—can and should be decided by the trial court as a preliminary question of law. The "factual issue"— whether the vessel was actually intercepted in those waters—is a wholly different matter, one that must be decided by the jury. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding that due process demands that each fact necessary to constitute a crime must be submitted to a jury and proved beyond a reasonable doubt). Thus, the district court's instruction, which omitted the issue of whether the OK Tedi was actually intercepted where the government claimed, was plainly erroneous.

■ Despite the two plain instructional errors, we need not reverse. The failure to instruct on every element of an offense is harmless "if the omitted element is undisputed." *Warren,* 984 F.2d at 327. Here, the government presented the uncontested testimony of Coast Guard Officer George Wilson that he spoke with and saw people "on board" the OK Tedi, and that the Coast Guard intercepted the OK Tedi "approximately 6 miles inside U.S. Customs waters."[2] Accordingly, because

2. The fact that the day after the OK Tedi was intercepted the Coast Guard retrieved several bales of marijuana from outside United States customs waters in no way casts doubt on the

positioning of the vessel itself. Rather, as testified to at trial, the strong wind and water currents carried the bales outside of United

neither of the court's instructional errors affected Smith's substantial rights, we need not reverse.[3] *Warren,* 984 F.2d at 327.

## III. Evidence of Prior Bad Acts

### A. Background

The government sought to introduce testimony that in the late 1980s, Smith (1) engaged in a marijuana grow operation with co-conspirator Albert Soricelli; and (2) had purchased several one-kilogram quantities of cocaine from Soricelli. The government claimed that the evidence was admissible under Federal Rule of Evidence 404(b) to show knowledge and intent, and to show why Soricelli, a leader of the organization, trusted Smith enough to invite him to take part in the importation endeavors. The court held that both acts "go[ ] to intent, knowledge, and [are] admissible under 404(b)." *Id.* at 316.

### B. The Court Properly Admitted the Rule 404(b) Testimony

■ Whether evidence falls within the scope of Rule 404(b) is a question we review de novo. *United States v. Arambula–Ruiz,* 987 F.2d 599, 602 (9th Cir.1993). If the challenged evidence falls within Rule 404(b), the district court's decision to admit the evidence under Federal Rule of Evidence 403 is reviewed for an abuse of discretion. *Id.*

■ Evidence of prior wrongful conduct is not admissible to show the bad character of the defendant. Fed.R.Evid. 404(b). "It may, however, be admissible

for other purposes, such as, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* To be admissible, the prior wrongs must: (1) tend to prove a material point; (2) be sufficient to support a finding that the defendant committed the act; (3) be similar to the offense charged, when they are being introduced to show intent; and (4) not be too remote in time. *United States v. Bracy,* 67 F.3d 1421, 1432 (9th Cir.1995). Both prior acts pass this test.

■ *Prove a Material Point:* "[E]vidence of prior criminal acts may be relevant in conspiracy cases to show the background and development of the conspiracy." *United States v. Hill,* 953 F.2d 452, 457 (9th Cir.1991); *United States v. McKoy,* 771 F.2d 1207, 1214 (9th Cir.1985). Smith's prior criminal endeavors with Soricelli would help the government provide the "background and development" of the conspiracy, and would help explain why Soricelli trusted Smith enough to include him in the risky scheme.

*Sufficient Proof:* Smith does not challenge that the government offered sufficient proof of his prior conduct.

*Similarity:* Smith correctly notes that simple possession of marijuana is not similar to the vast importation and conspiracy charges alleged in his case, and argues that his previous marijuana grow demonstrates only simple possession. Smith overlooks the testimony of two government witnesses: (1) Captain Kevin Lenahan tes-

States customs waters over the course of the night.

3. The government correctly points out that if the defendant is a United States citizen, it need not prove that the vessel was subject to the jurisdiction of the United States. *See* 46 U.S.C.App. § 1903(a). Although the Pre–Sentence Report indicates that Smith is a United

States citizen, the government did not allege or present any evidence regarding Smith's citizenship at trial. Nevertheless, the fact that Smith has never contested his United States' citizenship supports our conclusion that his substantial rights were not affected by the district court's instructional error.

tified that Smith's marijuana field was "approximately 25 yards–by–75 yards [and] [h]ad at least a few hundred marijuana plants in it"; and (2) Albert Soricelli explained that he and Smith planned to "split the proceeds" from the grow. This undisputed testimony demonstrates a "commercial quantity" of marijuana sufficient for an inference of sale. *Cf. United States v. Bramble,* 641 F.2d 681, 683 (cultivation of 21 marijuana plants not enough for "commercial quantity").

Smith claims also that his cocaine transactions are dissimilar from the instant marijuana charges because the drugs are different. However, "the relevant factor is the type of activity undertaken, *not the identity of the drugs." United States v. Vizcarra–Martinez,* 66 F.3d 1006, 1015 (9th Cir.1995) (quotation omitted). The government presented testimony that on several occasions Soricelli sold Smith a kilogram of cocaine for $40,000. These large-scale acts are sufficiently similar to the instant charges.

*Remote in Time:* Smith finally contends that because the prior bad acts occurred eleven years prior to this case, they are too remote in time. He is wrong. "[W]here prior acts were similar to those charged, previous decisions have upheld admission of evidence of acts up to twelve years old." *United States v. Rude,* 88 F.3d 1538, 1550 (9th Cir.1996). Here, the prior acts are similar to and probative of the charges against Smith, and their eleven year vintage is not fatal. *Id.; United States v. Ross,* 886 F.2d 264, 267 (9th Cir.1989) (13 year old prior act admissible).

In sum, the district court properly concluded that the prior bad acts fell within the scope of Rule 404(b), and based on the prior acts high probative value, correctly

exercised its discretion in admitting them. *See* Fed.R.Evid. 403.[4]

## IV. Prosecutor's Rhetorical Question in Closing Argument

### A. Background

At the beginning of the government's closing argument, the prosecutor stood up, faced Smith, and improvidently stated, "This isn't how it was supposed to end, is it Mr. Smith? You're not supposed to be here in Seattle. You're supposed to be down in the Florida Keys on a big sailboat, enjoying all that money you were going to make by importing marijuana." The prosecutor then turned to the jury and continued with his summation. Smith requested a mistrial, claiming that the question infringed on his constitutional right not to testify, but the court denied his request. *Id.* at 384.

### B. Analysis

Smith argues that the prosecutor's rhetorical question infringed on his Fifth Amendment right not to testify, as articulated by *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). We review *Griffin* claims de novo. *United States v. Mayans,* 17 F.3d 1174, 1185 (9th Cir.1994).

Assuming *Arguendo* that the prosecutor's theatrical comment was impermissible—an issue we do not decide— we need not reverse Smith's conviction. "We will not reverse when a prosecutorial comment is a single, isolated incident, does not stress an inference of guilt from silence as the basis for conviction, and is followed by a curative instruction." *United States v. Tarazon,* 989 F.2d 1045, 1051 (9th Cir.1993). Each mitigating factor is present here. The question was simply a

---

4. Also, the court instructed the jury that it could consider the prior acts "only as it bears on ... Smith's intent or knowledge ..., and for no other purpose."

lead-in to the assertion that Smith could have reaped substantial profits from the conspiracy had it succeeded. In context, no answer to the question could have been expected, nor was there any implication that Smith should have taken the stand to answer it. Indeed, later in his summation, the prosecutor stated: "Obviously, a defendant in this case has no burden to do anything. They're presumed innocent. They could sit there and do nothing throughout this trial."

Second, the prosecutor did not stress guilt on the basis of Smith's failure to testify. The prosecutor did not say, for instance, "Smith could have told you why he was on that boat. He never did. Why do you think he didn't?"

Finally, the court specifically instructed the jury that "[t]he defendants are presumed to be innocent and do not have to testify or present evidence to prove innocence." Under these circumstances, any prejudice suffered by Smith was harmless beyond a reasonable doubt.

## V. Alleged Brady Violation

### A. Background

Prior to trial, Smith requested from the government (1) satellite tracking information; and (2) the precise location of the OK Tedi when it was intercepted. In response, the government disclosed the precise location of the OK Tedi, but did not provide any satellite technology information.

The court held a status conference during which Smith's counsel stated that he "was seeking [satellite] information that will help us determine the location of [three boats, including] the OK Tedi...." Based on the detailed information already disclosed by the government, the court held that the government need not re-spond further to Smith's request for satellite information.

### B. Analysis

■■■ Smith asserts that the government withheld material, exculpatory evidence in the form of satellite tracking of the OK Tedi, and therefore violated *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "We review allegations of *Brady* violations de novo." *United States v. Ciccone*, 219 F.3d 1078, 1085 (9th Cir.2000). Smith's claim lacks merit.

We agree with Smith that the location of where the Coast Guard intercepted the OK Tedi is relevant to whether the vessel was subject to the jurisdiction of the United States, as required by 46 U.S.C.App. § 1903(a). The government notified Smith that the Coast Guard located the OK Tedi "in the vicinity of the 'J' Buoy with a Differential Global Positioning (DGPS) position of 48.27N and 124.48W." In this way, the government identified for Smith the precise location of the OK Tedi, although the information was not gleaned from satellite tracking of the vessel.

Equally important, according to the government, "there simply [is] no additional information—from satellite sources or otherwise—about the location of the OK Tedi." Smith has not identified any tangible evidence to show otherwise. We find no *Brady* violation on this record.

## VI. Apprendi Error

### A. Background

Each count of the indictment charging Smith stated that the "this offense involved one thousand (1000) kilograms or more of marijuana." However, in Instruction 33, the court told the jury that "[t]he government is not required to prove that the amount or quantity of marijuana was

as charged in the Indictment. It need only prove beyond a reasonable doubt that there was a measurable or detectable amount of marijuana." Smith did not object to this instruction. During deliberations, the jury asked the court whether "instruction 33 appl[ies] to *all* counts or only count 4?" The court answered "all counts."

Smith filed a motion to vacate his conviction on the ground that the jury did not find drug quantity beyond a reasonable doubt, citing *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). The court denied Smith's motion. The Pre–Sentencing Report (PSR) stated, and the court agreed that Smith was responsible for 8,845 kilograms of marijuana for his participation in the two attempted marijuana importations.

**B. Analysis**

Smith argues that his conviction and sentence are constitutionally infirm because the jury did not find him guilty of any specific quantity of marijuana. *Apprendi v. New Jersey,* 530 U.S. 466, 489–90, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Smith objected to the jury's failure to make a quantity finding in his motion to vacate and in his sentencing memorandum, so we review his *Apprendi* claim de novo. *United States v. Garcia–Guizar,* 234 F.3d 483, 488 (9th Cir.2000).

 Because drug quantity can increase the statutory maximum sentence to which a defendant is exposed, it must be alleged in the indictment, submitted to the jury, and proved beyond a reasonable doubt. *Id.; United States v. Buckland,* 277 F.3d 1173, 1182 (9th Cir.2000) (en banc). Here it was not, and the government concedes that *Apprendi* error occurred.

Thus, Smith's conviction and sentence "cannot stand unless the district court's constitutional *Apprendi* error was harmless beyond a reasonable doubt." *Garcia–Guizar,* 234 F.3d at 488.

The government presented uncontradicted testimony that the Cambodian load contained in excess of the 1,000 kg minimum to convict under Count 4. Cambodian Police Officer Bun Vimal testified that his force retrieved "about three tons [about 2727.27 kgs]" of marijuana at the Cambodian port where Smith was arrested.

The government presented uncontradicted testimony that the OK Tedi load also contained in excess of the 1,000 kg minimum to convict under Counts 2 and 3; *see* 21 U.S.C. § 960(b)(1)(G). Arthur Torsone, one of the organization's leaders, testified that "he believed" that the OK Tedi contained "12,500 pounds [5,681.82 kgs] of marijuana" before the crew set fire to and sank the vessel. Moreover, a Customs agent testified that the Coast Guard had retrieved at least 1,560 kgs of marijuana from the water near the OK Tedi.

The court instructed the jury that the government need not prove the drug quantity. During the jury deliberations, the jury sent a written note to the court asking if that instruction "appl[ied] to all counts or only count 4?" This note raises a question about whether the jury believed that the OK Tedi load (Counts 2 and 3) actually included over 1,000 kilograms. Although Smith did not contest any of the government's quantity assertions *at trial,* he had no reason to do so at that stage, where the jury had been instructed that the government need not prove the drug quantity. His failure to object to the drug quantity *at sentencing,* however, cannot be explained by lack of an incentive to contest the evidence. At sentencing, when the court offered Smith the opportunity to "object[ ] to the facts as stated in the [PSR]," Smith stood silent. The PSR identified

the quantity of marijuana as almost 9,000 kilograms.

We therefore conclude that the uncontradicted testimony of Torsone and the Customs agent, along with Smith's failure to challenge any of the facts in the PSR based on that testimony, outweighs any minimal doubt raised by the jury's question. The unchallenged findings regarding quantity demonstrate beyond a reasonable doubt that no reasonable jury could have believed that the OK Tedi load contained less than 1,000 kilograms of marijuana.

Finally, because the OK Tedi load and the Cambodian load each contained in excess of 1,000 kg of marijuana, the conspiracy count (Count 1), which encompassed both loads, necessarily included in excess of 1,000 kg of marijuana.

## VII. Minor or Minimal Participant

### A. Background

The PSR recommended, and the court agreed, that Smith was not entitled to a downward adjustment for any alleged minor or minimal role in the conspiracy.

### B. Analysis

 Smith claims that he is entitled to a two, three, or four point downward adjustment on the basis of his alleged minor or minimal role in the offense. U.S.S.G. § 3B1.2. We review for clear error the district court's determination that Smith was not entitled to such an adjustment. *United States v. Sanchez–Lopez*, 879 F.2d 541, 557 (9th Cir.1989).

To get a two-point adjustment as a "minor" participant, Smith must show that he "is less culpable than most other participants...." U.S.S.G. § 3B1.2. cmt. 3. The PSR, which was expressly adopted by the district court, contained sufficient facts to show that Smith was not less culpable than most other participants. Smith may not

have been the financier or leader of the organization, but he (1) was involved in two of the three attempted loads; (2) flew to Washington state to arrange for a safe off-load of the OK Tedi; (3) was aboard a small cutter dispatched to help the beleaguered OK Tedi and its expensive cargo; and (4) went to Cambodia to act as the captain of the second boat bringing in the second load. Based on these facts, it was not clearly erroneous for the district court to determine that Smith was less culpable than most of the other participants. Because Smith is not entitled to a two-point minor role adjustment, he is necessarily precluded from the more lenient three and four point adjustments.

**AFFIRMED.**